May it please the court, counsel. My name is Kyle Waller. I'm here today on behalf of the appellant and cross appellee Union Pacific Railroad Company. We are here today asking the court to follow the precedence of this circuit and find the trial court erred in precluding Union Pacific's expert witness Hans Ewand from testifying as to his ultimate opinions on causation. There are a number of other issues on appeal, but I'm going to focus on those. If the court has questions about the other issues, I will try to get them, but if there's a factual question, a question about the preemption issues on cross appeal, or the directed verdict issue on cross appeal, I'm happy to entertain questions at any point in time. I would submit, Your Honors, that Union Pacific was prejudiced by the trial court's ruling, and the reason being was that Mr. Ewand was never allowed to provide his opinion on the DeWitt and Martin Bay derailments to occur. As a result of that, Union Pacific was deprived of having the jury weigh the respective opinions of the experts, evaluate those opinions, and reach a determination. In doing so, the trial court didn't follow a lot of precedent out of this court, and we'll talk a little bit about the precedent later. There's four cases I'm going to talk about. As a result, we're going to request that this court reverse and remand the matter for a new trial. It's a fascinating case in terms of all the diagrams. It would be fun to go to that railroad repair shop. How many tons of pressure does it take to push those wheels on those axles? My recollection is somewhere around 50,000 pounds, but it's been a while since I've addressed that issue. It's irrelevant, but it's fascinating. What was the fact that you were trying to establish, that the axle failed because Rail Progress did not remove the pre-existing corrosion pits during their turning process? Sure. Just to help the court. The process is such that railroad parts are reused, and they're reused on a regular basis. I didn't realize they reused those axles so many times. The reason why is because steel is a resilient thing. The issue is, is that steel of such a diameter and such a smoothness that it can undergo the pounds per square inch pressure that's applied while it's in operation? Right. Let's see. These are 286,000 pounds cars.  There are four axles. Each one would carry 71,500 pounds if the equalization was working. That is correct. That is correct. What happens is those axles... Have you found out that going from 263 to 286 has resulted in more axle failures? No. I would dispute that that's the case, Your Honor. Oh, I don't know. The pen has nothing to do with the case, but it's fascinating. It is. There's a lot of interesting science in the case, Your Honor. But back to your question, what happens is those axles are sent into shops, and there's... And they're put on a big lathe and turned down. Well, that's not necessarily the entire process. The first process is there's some dirt and grime on there that normally needs to be washed off and cleaned off. And then what you're allowed to do is you're allowed to take a sander that has 80 grit or finer sandpaper. And then you clean that area to remove it. And then you send it... I can't remember the exact line, but then it's examined to make sure that it's been cleaned. And there's also a magnetic particle examination to make sure that it's been cleaned. If the cleaning is not sufficient, then sometimes the wheel shops will take a lathe and clean that fillet area to peel back the steel so that it's nice and smooth. So with that being said, the Court precluded Mr. Ewan from offering his ultimate opinion that Progress Rail's failure to properly perform that service caused the axles to fail. And her reason for disallowing his testimony was that he admitted that he could not say what? That he could not opine on something? Well, and I want to talk about two different things, Your Honor. First is the trial court's ruling... I'll shut up for a while and let you make your argument. That's just fine. I'm here to answer questions. It is for me to shut up. It's more important that your questions are answered than mine. There's a couple of points from the record I want to point to. Number one, the trial court's ruling. First and foremost, in its written order, the trial court basically indicated that Mr. Ewan would not be allowed to offer an opinion as to the ultimate issue of causation. He would not be able to say that pits and cracks that were not removed caused the axles to fail. Well, then we went to trial, and the court in its ruling said in limne. And in in limne, that always says in my mind there's another opportunity to get to the court and talk to the court. And the court kind of indicated we can talk about it again at trial. And so Ewan testified at length about what he went and did. And during the course of the trial, it came up again as to whether or not his opinion should be admitted. And in discussing that issue, the trial court stated as follows, and I quote verbatim, I believe that Mr. Ewan has certainly expressed legitimate opinions regarding the fact that stress fractures on those journals caused the journals to break, and that the breaking of the journals led to the derailments. She went on to state, and I believe he, Ewan, has offered legitimate opinions that certain pits and cracks in the journals fillet area were present at the time progress rail refurbished the axles. And he has expressed opinions that pits and cracks can cause journals to fracture. And this is the last sentence I want to focus the court to. And he has expressed opinions that other causes are not present. So the court, on the record, indicates that he followed valid methodology in ruling out other causes. But he's not allowed to offer his ultimate opinion. And I would ask this court to consider and ask a rhetorical question. You know the rules now allow them to give experts and give evidence all to an opinion. But that's not absolute. The court has the discretion to say, no, I'm talking about in the abstract now. And why is this not . . . the court has said, I'll take you right up to the line, but I'm not going to allow him to tell the jury his opinion on how they should decide the case. That certainly was the rule for a hundred years, but . . . Well, certainly with 702, Daubert, and Kumo, there has been a liberalization with respect to the admission of expert testimony. And this court has said that on numerous times. And I would point the court first to the case that was decided this summer by the court, which was not cited in any of the briefs because it was just decided in June. And that's Johnson v. Mead, which is 754 F. 3rd 557. And if the court may recall, that's a CSAC case. And in that case, the child had CSAC and had ingested Infomel. And it's known that Infomel causes CSAC. But the expert was precluded from tying the two together and precluded from testifying on that issue. Okay? Here we know the same thing. We know Pitts caused cracks. We know that Ewan ruled out other possible causes. Why can't he put the two together and say that? Why shouldn't he be allowed to say that? Well, the old view was because that's the jury's decision. Well, but their expert . . . You agree with me that while the rules now allow that the court . . . that you can give the ultimate conclusion, that's still at the discretion of the trial court? Sure. But why should the defendant's expert be able to give ultimate opinions and the plaintiff's not? Well, okay. We'll come to that. How did that harm you in your ultimate argument? I mean, you're making a great argument here. You could do the same thing to the jury and just say it couldn't be anything else. Because the jury, number one, doesn't get to hear it from the expert, and that's important. Number two, and more importantly, look at the closing argument. All we heard repeatedly was they haven't told you what caused these axles to fail. They can't tell you what caused these axles to fail. If you look at the Fox v. Dannenberg case out of this court, and that citation is 906 F. 2nd 1253, that's a case where there was an ejection issue, and there were two passengers in the vehicle, both of whom were ejected, both experts who followed the same methodology. One said, based upon the evidence, you cannot tell who was driving. The other one said, I believe it was A or B that was driving. Same methodology. One was allowed to say no conclusion. One wasn't allowed to testify at all. This court said that that's reason to reverse the remand and retry it, because both parties should be afforded to have that opportunity to hear their experts reach those conclusions. And again, had he been permitted to testify, Mr. Iwan would have said the axle failed because of? Progress rails, failure to properly recondition the axles and remove the conditions in the axles. Which were the pre? Pre-existing pits and cracks. Incorrect. There's a couple other cases. Again, did Chief Judge Larry Smithcamp rule out his testimony because he was not technically qualified to make that opinion? There was no explanation as to what the flaw in the testimony was and why he was not allowed to testify. If you look at the trial court's order, all it does is say, I don't think he's got sufficient methodology. There's no explanation as to what the flaw in the methodology is. And then at trial, the judge says, well, he certainly followed sufficient methodology to rule out other causes. I don't understand the logic between those two. If he's got sufficient methodology to rule out other causes, he should be able to testify as to what the cause was. Not to mention the fact that this court has said on repeated occasions, an expert's not required to rule out all other causes. An expert is only required to rule out, have a good methodology. According to progress rail's brief, his attempt to link the fatigue cracks because of pre-conditioning corrosion pits was entirely speculative and not based on reliable methodology. Did the district court say that his methodology was lacking? There was a conclusory statement. But then I point you to the statement that the court made where he said he ruled out all other causes. Well, if that's good methodology, how do those two fit together? They don't. He ruled out train handling. He ruled out everything. Differential. Exactly. And if you compare the work that was done by Brown versus Ewan, Ewan did substantially more work with respect to formulating his opinions. Brown comes in on August 2nd and 3rd, 2012, looks at parts of the axle, performs a finite element analysis based upon guess and conjecture. He offers his ultimate opinions. Ewan follows the same exact methodology. He reviews the metals, examines the metals. As Dr. Brown says, the metals tell a story. So that's what the methodology is. You look at the metal, you examine the metal, you evaluate the metal, and you make a decision. He did it, reached one conclusion. Ewan reached a different conclusion. One was favored over the other. You're running out of time. Why don't you make your comparison that you said if the court's going to limit your experts, it should have limited progress or whatever their name is. I think that's a different discussion, and now I'm getting back into my rebuttal time, but to answer your question, I would submit there's a difference. There's a substantial difference what Ewan did versus what Brown did. Ewan was there from the beginning. I mean, Martin Bay, he goes to the derailment. Now, that's going to wait. Go right because your time's running out. Go right to the point. I'm not sure that they got the ultimate conclusion from the other expert, but you tell me if I'm wrong. My recollection is that with respect, and I may mix them up, my recollection is with respect to Witt, he said it was an old axle and basically it was fatigue failure due to overuse. And then with respect to Martin Bay, he said that there was a fretting mark on the axle which creates a stress riser which caused the axle to fail. And I may have flipped them, but those are the two conclusions that he reached, and that was what was argued in closing by counsel. If you have other questions, I do want to be able to come back up here and visit with you again after Mr. Coyle speaks. Okay. Thank you, Judge. Good morning, Mr. Coyle. Good morning, Your Honor. You can lower that. If I could. All right, may it please the Court, Mr. Hasek, Mr. Waller. Good morning. My name is Michael Coyle, and I represented Progress Rail in the case that we tried to a jury for a couple weeks last summer in Omaha in front of Judge Smithcamp. I want to answer some of the questions that you've asked here, Judge Woolman, as well as you, Judge Riley, but a couple of important facts. Railroad axles are like wheels under roller coasters. The entire axle spins inside of a bearing. So if you see a roller coaster car, it's the same principle with a train. Now, two things, there's three really important facts here that the Court needs to know about. First of all, the axle from DeWitt was 28 years old. The axle that failed at Martin Bay was 38 years old. The testimony was undisputed at trial that these axles were forged and designed for 263,000 pounds. Somewhere in the 1990s, the FRA and the AAR got together, and they re-rated them for 286,000 pounds, and that's per car. So that means on a 125-train coal car, you're hauling another five or six tons of coal in each car. That's why they did it. Now, when you talk about reconditioning a wheel set, what happens is, since the entire wheel and axle spins, and you're correct, Judge Wolman, it's pressed on with 25 tons, the wheel is, as well as the bearing. These axles will come in for reconditioning for a variety of reasons. For example, some companies will say, we're going to pull every wheel set off after five years. Sometimes the bearings get hot. They burn up, and then they've got to be pulled off. Sometimes a train will drag a car. They'll try to release the brakes. The brakes don't get released, and when they drag a car, it's called a run flat. It will actually create a flat surface on the wheel. So when you hear a train come by that's going bang, bang, bang, bang, bang, that means that it's got to run flat on it. They've got to pull that off. Now, when they pull them off, sometimes they'll just pull off the bearing. If there's enough tread left on the wheel, they'll just return the wheel. But they always pull off the bearing. Sometimes they pull off the bearing and the wheel, and they'll put a new wheel on it. But when the axle's in the shop, what they'll do is they'll inspect it to see if there's any imperfections or dings or gouges, because those can be stress risers. And then they'll fix them in one of two ways. They'll either put them on a lathe and take the imperfections out of them, which they did in one of these cases, or if they leave the wheel on, then they'll use a special grinder and they'll clean them up. Now, here's a fact that their expert couldn't get around. Corrosion pitting arises on an axle in a matter of weeks, because the problem that Mr. Ewan had at the trial, and that they couldn't get around, is that one of these axles had been in the field for five months, and the other one had been in the field for 15 months at the time that these trains derailed. So one of the things we asked the Union Pacific, a request for admission, how long does it take for corrosion pitting to develop on an axle? It's weeks. Now, I think that an easy example of that, if you take your pruning shears or your saw and you're working in your backyard and you leave it out there for a week and you find it the following week and it's rained a couple days, you can see what happens to the metal. Metal starts to corrode immediately, and when these wheel sets leave these facilities, it's raw metal. Now, everybody knows what a train car does. It goes through sleet, it goes through snow, it's in a corrosive environment on the coasts. But here's the problem. Corrosion pitting can develop in weeks, and that's the problem that Mr. Ewan could not escape. In other words, the corrosion pitting that he purportedly observed on these wheel sets  whether it was corrosion pitting that grew, that developed in the five months or in the 15 months it was out in the field. Now, what Judge Smith did, and I will respectfully suggest, Your Honor, that this needs to be analyzed as an abuse of discretion. She did two things. Her limitation on Mr. Ewan was very, very narrow. And the Union Pacific doesn't point out, I had two experts. I had Dr. Ed Cox, a metallurgist from Texas, and I had Dr. Stuart Brown from MIT, another metallurgist, mechanical engineer. She limited a lot more of Dr. Cox's testimony in a Daubert motion prior to trial than she did with Hans Ewan. But here's what she ruled on his admissible testimony. We took Mr. Ewan's deposition twice. He appeared as a 30 v. 6 witness. I deposed him for the full time. Then they produced him as an expert, and I deposed him again. Now, their position, and here's where she limited him, pits that were in the axle when they left Progress Rail's plant after it was refurbished caused the axles to fail. It's the only thing that she eliminated. Now, here's the basis for Mr. Ewan's testimony. Number one, Progress Rail failed to remove the pits when reconditioned either 5 or 15 months before the derailment. Number two, corrosion pits caused the axles to fail. Number three, the corrosion pits that caused the axles to fail were the ones that existed on the axles when they were reconditioned rather than ones that formed on the axles after they left Progress Rail's facility. So, Judge Woolman, I want to answer the question that was asked of you. The methodology is where she zeroed in on. This is what he told me in his deposition. He could not trace the fatigue cracks, which he claims caused the axle failures, to any corrosion pit. He said that corrosion pits are inherently difficult, if not impossible, to predict. Number three, Mr. Ewan did not attempt to determine whether any of the corrosion pits developed on the axles after Progress Rail reconditioned them. Mr. Ewan told me that it is not possible to determine the age of a fatigue crack without knowing the exact applied stresses which were unknown for both DeWitt, the derailment in DeWitt, Iowa, and the one in Martin Bay, Nebraska. Now, I asked Mr. Ewan, I said, what did you do? Did you do any testing to determine if these fatigue cracks on the Martin Bay axle were less than five months old, in other words, formed after they left our plant? No. And he acknowledged that he doesn't even have the ability to do that. He had no methodology or ability to determine the age of a particular corrosion pit. He further testified that he did not do any type of testing or follow any protocol to determine how old the corrosion pits were, and he had no ability to do so. He told me that the only methodology that would have enabled him to determine the age of the corrosion pits could not be used for either the derailment in DeWitt, Iowa, or Martin Bay, Nebraska, because he lacked the necessary information regarding the loading environment of the axles. The methodology Ewan used to purportedly determine that the axle failures were caused by corrosion pits that existed when they left our reconditioning facility were merely his visual inspection of the severity or depth of the corrosion pits, but he took no measurements. He took no measurements of the severity or the depth of the corrosion pits, and he told me that there's no scientific basis for linking the size or depth of corrosion pits to the age of the corrosion pits. He also told me that there are no studies that would enable a scientist to determine whether a corrosion pit is not 5 months or 15 months old, and that there are no studies analyzing how long it takes these things to form after reconditioning. Now, we sent him a request for admission. How long does it take to develop corrosion pits? They told us it takes weeks. So these things were out there for 5 months or 15 months. Now, I want to go back and answer your question, Judge Woolman. What Judge Smithkamp got hung up on was the methodology. She said there's absolutely no way that this expert can come in and link these to these pits. Now, Dr. Brown, see, and this is the problem that the railroad had at trial. The problem is that in order for Ewan's theory to make any sense is that he had to somehow connect corrosion pitting with how these axles failed, and he was unable to do that because in order to hang this on progress rail, they had to say, hey, you didn't clean these axles upright when you reconditioned them. So he was stuck with tying his opinion to the corrosion pits. So what we did is after, I don't know, 14 hours, 12 hours of deposing Mr. Ewan, we filed a Dobbert motion, and Judge Smithkamp came back and said there's no valid methodology for him to tie these two things together. Now, Dr. Stuart Brown, and to answer your question is, he used an entirely different methodology to express his opinions to the jury. He wasn't anchored or burdened with the problem of trying to connect into the corrosion pits. No Dobbert motion was filed on Dr. Brown. I don't know why. But when we got to trial, I put him on the witness stand, and he did an entirely different methodology. Now, I'm going to start with DeWitt. He said, okay, if there's a theory that a corrosion pit caused this axle to fracture, then I'm going to examine it under an electron microscope, and I'm going to see if any point of the fracture site is connected to a corrosion pit. He turned around and looked at the jury, and he said, no, I couldn't find one. So he wasn't there to the opinions that he expressed. He couldn't find one? He couldn't find a corrosion pit. On the DeWitt one? On the DeWitt, that's correct. Now, I want to go back to Martin Bay, because what happens is, yeah, you're correct, Your Honor, this is fascinating, because everything's reused at the railroad. But these axles are 40 years old, and if you haven't seen a coal train go by, there's no rest for the coal trains. They're running 24 hours a day, 7 days a week, and they're really taking a pounding. The other issue is that they've put another 11 tons in these cars. So every time they recondition them, they might lay them or grind them a little, so the bearings don't always fit the way they did when they were brand new. So the bearings create something called fretting, and fretting is it causes marks on the axle because they've been. . . In other words, they can't find bearings to fit the size of the turned-down axle? Well, they don't fit as good as they did when they were OEM, when they were brand new. How many thousandths of an inch difference is there between the interior of the wheels and the axle? It's beyond the bandwidth of what I know, but it's not very big. It takes 25 pounds. That's correct, and that's what holds them on. But back to the bearings, does that have anything to do with this case? Well, what he did is he offered his explanation, based upon physical evidence and electron-micron photographs of what he thought, because it was undisputed that it was high cycle fatigue. Now I want to go back to this whole thing about differential diagnosis. All of the experts agreed that the axles failed because of high cycle fatigue. That's a code word for they just wore out. Now he says that they eliminated train handling and track conditions and imperfections in the metal, but there's multiple ways you can have high cycle fatigue. He didn't eliminate any of those. Like what? Well, for example, I'm not a mechanical engineer, but we just talked about, for example, fretting. That's what Dr. Brown talked about. That's a completely different methodology. So Mr. Ewan didn't eliminate anything. This wasn't a differential diagnosis. He came up with three or four things and claims he ruled them out, but they didn't rule out all the different methodologies of how you could have high cycle fatigue. So I will suggest to you, Your Honor, that the difference between Dr. Brown and Mr. Ewan is this, a completely different methodology supported by physical evidence that I laid foundation for at the trial. There was no dauber, and I hate to do this because I'm a trial lawyer too, but there was no objection to any of this in the record. I mean, yes, did they make some objections early on and some sidebars, but I was able to elicit all of the opinions from Dr. Brown without objection. Now, in all due respect, this was a long trial, and I think the standard is abuse of discretion. And I'm telling you, Judge Smithcamp worked long and hard on this. It was the subject of extensive briefing and pretrial motions and at least 12 hours of testimony from Mr. Ewan. And what she did not allow him to testify, Judge Riley, is just that itty bit. And what she said, it's right on the record, I think there's enough here, Mr. Waller, to let this jury connect the dots. But there's not enough from his methodology to say it was caused by the corrosion pity. So what I'd ask you to do is, since the abuse of discretion is such a hard standard for the railroad, I'd just ask you to affirm it and everything about the trial. Now, if you got heartburn about Dr. Brown, I don't think you will. Then the case never should have gone to the jury because Mr. Ewan was never able to express an opinion on proximate cause. I don't think how an axle fails under a coal train car is something within the common, ordinary knowledge of 12 people in Omaha, Nebraska. I think you may have gone too far now because what Judge Smithkamp is saying is everything's there, but you're not going to do the ultimate conclusion. No, that's correct. And there's enough to go to the jury because they can draw their own conclusions. Very well. And the only argument I'm making is that if they get past this in all due respect, I think under an abuse of discretion standard, they just can't. Because I think there's a sound basis for her ruling. Now, I just want to mention our cross appeal, and I'm going to take the last 10 seconds to do it. I don't think you'll get to it if you affirm what the jury did in Omaha last summer. But I would suggest to you, and Judge Riley, can I just complete this statement and sit down? If you can do it quickly. All right. If the Federal Railway Administration wanted to extend the obligation for rail car safety to third parties beyond the railroad, who's the only person identified in the Code of Federal Regulations, they know how to do it. And we cited probably 20-some examples in our brief. And we believe, I don't know if you'll get to this issue because of the abuse of discretion standard and what happened in the trial court, but I think that this claim is preempted and it should not have gone past the motion to dismiss. Judge Riley, thanks for the additional time. Thank you. And Mr. Waller, you have some time. Thank you. I gave Mr. Coyle a little extra, so why don't you give him three minutes and we'll go from there. Thank you, Judge. I want to address a couple of points. An issue was made about the change from 263 to 286. With respect to that, I request the court look at Exhibit 16 from the trial. Exhibit what? Exhibit 16 from the trial. Very good. Exhibit 16 is Progress Rail's study with respect to corrosion pitting on axles. That study concludes if you don't remove pits, the axle's going to fail. It's not if, it's when. And the reason for that is a failure to remove a pit increases the pounds per square inch by 9.42 times. Number two, the request for admission. How long does it take pits to form? We objected to that. It was overruled. All it said was how long does it admit or deny that pits can occur within weeks? Well, depending upon the circumstances and what was done and not done, that's true. And under the rules, you have to respond to that. There's a thing called tectal. And when that axle's put back together, it's a rust preventative, and it's slathered on that fillet area. And then that bearing is shoved on there with all those pounds of pressure. And as that bearing is shoved on there, that bearing pushes that tectal up there, and it creates a bead. So it stops that corrosion pitting from occurring. Now, the allegation that Mr. Ewan could not establish that there were pits that predated the reconditioning, not correct. If you look in the record, he talks about striations and rounding of pits. What does that tell you? Normally a pit is jagged because it's corrosion. You take that metal with that sander and you start rubbing it off, and it's like you're sanding a piece of wood to get out that hole. If you don't get all the way there, the edges are rounded, but you still have the hole. That's what he saw. He saw pits with rounded edges, which indicated they had been worked on, but not completely removed. Okay? So his conclusion was those pits predated the reconditioning. Okay? Now, all of the other issues as to whether or not there are other causes, this court has repeatedly said it's not an expert's responsibility to rule out every other cause that exists. The responsibility is to have good methodology. If he has good enough methodology to rule out all other conclusions and reach the conclusion that that's it, you've got to let him off of that testimony, especially when their expert gets to do it. And I will disagree with Mr. Coyle. With all due respect to him, the experts followed the same methodology. Ewan did more work, but they both did the same thing. Ewan did magnetic particle testing. He did electronic or magnetic, excuse me, microscopic examination of the metals. He did all of that work. So it's the same methodology. It's no different. It's the same methodology. It's different conclusions. Both experts. That's just not the way it should be, Your Honors. Okay, your time's expired. One point. Make it quickly. These aren't our rail cars. They did the work. The wheelsets were put underneath the rail cars. Union Pacific doesn't own and maintain these rail cars. They're the ones that put the wheelsets out into the stream of commerce. Thank you very much for your time today, Your Honors. I appreciate it. Thank you. And that raises a question that I have. Come back over here a minute. These rail cars are usually owned by the shipper or whoever. Were these? But UP owed some. But were these cars that failed owned by somebody else? Yes. The answer to your question is it depends. But in this instance, one was a coal car owned and operated by a rail car management company and then leased to an energy company. And if I recall correctly, the other one, they may have both been coal cars. Now I'm mixing my cases together. But Union Pacific didn't own either one of them. They're owned by third parties. The cars then get interchanged in between different railroads and get hauled around the country. May I ask one irrelevant but interesting question? One of these trains was 135 cars long? That's correct. I didn't know they had exceeded 110 or 150. They can and they do when they're allowed to. And they must be using distributive power or pushers to keep the slack around together. Absolutely correct. It has nothing to do with this case, but it's interesting. To some people at least. All of us have our quirks. Thank you. Thank you both. It's a very interesting case, and we appreciate your arguments. We're very well done. And we thank you. I don't think I'd want to try cases in Omaha against these people. Well, a couple of these lawyers I've known for a long time, and they're really not that good. Not true. Not true. They're very good. So thank you. We will take it under advisement and be back in due course. Thank you. Thank you. See you. Okay, Ms. Zell, would you call the next and last case of the day, please? The last case for evidence is United States v. Harrison State.